Appeal Number 21-2916. We'll hear first from Mr. Bruckheit and then from Mr. Scharf. Go ahead, Mr. Bruckheit. Good morning and may it please the Court, my name is Brad Bucott on behalf of the appellant Jane Doe JJ. The sole issue on this appeal is whether Jane received the procedural due process she was required or entitled to under the Fifth Amendment. The Bankruptcy Court said yes, I respectfully submit that she did not and that's reversible error. This court has made abundantly clear in Fogel versus Zell, reasonably ascertainable creditors, i.e. those who can be identified through reasonably diligent searches of a debtor's own books and records, must receive actual notice of certain key dates including the claims bar date in a bankruptcy before they can be bound by the discharge injunction associated with a confirmed plan of reorganization. In this case, a reasonably diligent search of the debtor's books and records must have disclosed that Jane was treated by Dr. Larry Nassar on multiple occasions. Mr. Bruckheit, so USA Gymnastics has those records, you can confirm that as you stand here? We cannot confirm that, Your Honor. We cannot. Our position is they should have maintained those records. Our position is that under Michigan law, doesn't it have to be a licensed public health professional or health facility or agency? That's how the law reads, Judge. And how does USAG qualify? Well, I would argue that if an entity is employing a physician to treat gymnasts associated by that entity, then that entity should maintain the records of those treatments. I know it's not quite the letter of the law, but it seems as though it should be the spirit of the law. That's a lot though, right? I mean, that's a big ask. If any entity employs a doctor for any reason, then that entity is the argument. It's a bit of an ask. And with what obligations of confidentiality? I mean, let's assume, forget Dr. Nassar for a moment. Sure. Suppose it's some other doctor treating a gymnast who has medical issues for a teenage girl that are highly sensitive. Okay. Who has access to those records? I would say the doctor and the agency employing the doctor. So, the sanctioning group of the sport would have access to those kinds of medical records. That's a, that's, this is, you're going way beyond what would be a normal, what I think of at least, is a kind of normal doctor-patient relationship and with obligations of confidentiality. Right, but I don't know if it's that far beyond. If, for example, you're being I believe the statute says that Methodists would have to maintain the records on behalf of the physician treating. Right. Well, what about like the Detroit Tigers team doctor? Okay. Do the Detroit Tigers have to maintain the records? Does Major League Baseball have to retain the records? Does the Players Association have to maintain the records? Who would have them? Who would have a duty of confidentiality under Michigan law? Well, I think that statute says the Tigers would have to maintain the records if they're employing the physician. What about Major League Baseball? Would they have to have them? I don't know the between Major League Baseball and the individual clubs within the league. I'm sorry, go ahead. Well, actually, you just said you think the statute says they have to maintain. Does the statute? Because the statute talks about health care agencies and it defines them. And so, how do you find, how do you see that USA Gymnastics meets the statutory definition? I understand what you're arguing is a should. Maybe it is a should. I don't. We have to, we would have to rule on what the statute actually says. I don't think you have to rule on what the statute says to know whether, we don't know whether USAG knew that Nassar was treating Jane. USAG has not made known who it knew that Nassar treated. For example, it says that it doesn't, you know, it doesn't deny the knowledge that Nassar treated Jane. They only denied that she made a claim to but according to the committee's own brief, they sent actual notice to more than 1,300 individuals, even individuals who never formally or clearly notified USAG of their claims. So, if they chose to send actual notice to these victims that did not actually file claims, they've never told us what the methodology was in coming to, you know, to decide who to notice, right? So, you know, and if they don't know who these other girls were, how do they, how do they know that they were entitled to actual notice? How do we know, I, you know, and I'm not quite sure how this factors in, so you can tell me your view. How do we know that Jane didn't receive one of those emails or wasn't sent one of those, what, 360,000 emails and they got a bounce back? We don't know. The only evidence in the record is that she didn't receive any notice from USAG until she met with a lawyer, and I believe September of 2019, to discuss her rights. After she finally came to the conclusion she'd get abused at the hands of an asshole over the course of years. And when she testifies that she didn't realize that she had been abused until August 2019, how do we know had she received one of those 360,000 emails, she would have known she had been abused at that moment? It may have rung a bell. I don't know. I can't say that for sure. I'm not a psychiatrist. I don't know how these, how these things work, right? But she claims that she had, she struggled to come with, you know, to grips with the fact that she'd been abused at his hands over the course of years. So Jane's not arguing that she's entitled to actual notice merely because she was a gymnast, nor is she arguing that everyone who ever came in contact with USAG was entitled to actual notice. Instead, she's arguing that everyone who ever came in contact with Larry Nassler was entitled to actual notice because a reasonably ascertainable creditor or claim arises from facts from a lawyer reasonable better, based on a careful examination of his own books and records, to the possibility of a claim. The bankruptcy court erred by shifting the burden to, to Jane to make herself aware of the bankruptcy when the burden of establishing actual notice lies with the debtor. If there's no further questions, I'll reserve the remainder of my time. Thank you very much, Mr. Buchheit. For the, let's see, this is for the committee, correct? I think at this point my client is the settlement trustee, William Bettinelli, if there was a motion to adjourn. So may it please the court, Ilan Scharf for William Bettinelli, the settlement trustee of the USA Gymnastics Trust, was the successor to the committee on this appeal. Your Honors, there is one issue presented on this appeal. Was Jane Doe entitled to direct notice of the April 29th, 2019 deadline to file her sexual abuse claim? And the answer is decidedly that she is not entitled to such a direct notice. It is undisputed, the facts are relatively undisputed, it's undisputed that appellant filed her claim after the bar date. It's undisputed she didn't receive direct notice. It's also undisputed that she did not inform USAG of her abuse before the bar date. The sole basis for the appellant's claim that she is entitled to direct notice boils down to the argument that USAG was a medical provider that was required to maintain medical records of her treatment by Larry Nassar under Michigan law. Reliance on Michigan's health code is misplaced. First, as Your Honors have questioned, USAG is not a medical provider. It was and is an organization that provides a framework for gymnastics instruction in events in the United States. It is no more a medical provider than Little League, Peewee football, or a high school with a sports program. Second, the Michigan statute cited by appellant does not apply to USA Gymnastics by its own terms. The statute applies specifically to individuals. The first words of the statute are an individual licensed under this article shall keep and maintain records and then it becomes the organization employing that person to maintain the records. USAG is not an individual, is not a medical provider, and wasn't licensed and can't be licensed under Michigan's public health law to be a medical provider. So Mr. Scharf, it does appear that USA Gymnastics gave actual notice to some hundreds of women who had had contact with Nassar but who had not been abused. Let's understand the word claim here. There's a formal claim in the bankruptcy court where you file a claim. We're talking about they filed, they sent out 13, approximately 1,300 direct notices to people who had, let's use the word informed, USA Gymnastics that either they knew somebody had been abused or they had been abused themselves throughout USA Gymnastics history. That was the search of the records to find people who had actually come forward and said I was abused or my friend was abused, my child was abused. That's what the direct notice went out. But it needed a report of abuse to USA Gymnastics. Yes. And again, looking at the terms of Fogle and looking at the question of what is reasonably ascertainable, I think the district court opinion discussed this, that these meets, these gymnastics meets where appellant would appear as an elite gymnast had hundreds of participants. If you extrapolate that, and that's in one region, if you extrapolate that across all of USA Gymnastics regions across the decades that Larry Nassar, and let's not forget we're not just talking about Larry Nassar, there were 75 additional people who came forward asserting that they've been abused by other people over the course of USA Gymnastics history. You're talking about thousands, tens of thousands, maybe hundreds of thousands of people over the last however many decades that would have to get direct notice under that understanding of the law. I think under Fogle we also have to look at what was the totality of the noticing program. This noticing program involved an extensive constructive notice program, publication notice program. This wasn't what we typically see in bankruptcy cases. Can we go back before we get to constructive notice? There's that 360,000 who got the email. USAG sent that email to its current and former members. And the district court remarks that there's, it's really unclear on the record why Jane didn't get that email. Do you have any clarity to shed on that? If she spent 10 years with USA Gymnastics, was it in their records that she was a former gymnast? Whoever had provided it, I think they took every email in their record that for a gymnast. To be frank, look we're dealing with a very, with a population that was younger. My email address when I was in high school is certainly not the email address I use today. That internet company is probably defunct by now. Email addresses change over time. I can't explain why she would not necessarily have received the email, but the effort was made to provide it to every single email address in their system. Frankly also younger kids sometimes use their parents email address when they sign up when they're eight years old and it just stays in the system. I can't, I can't explain with any certainty what happened. But getting back to the constructive notice program here, this was probably the most extensive constructive notice process to date at the time of any bankruptcy case. And it wasn't a mere act in the legal section of the Wall Street Journal or another national publication. It was targeted for gymnasts. I think, I think we're all aware of that and this court has already been dealing with Nassar related litigation for quite some time. But this plaintiff is making a very different claim, an entitlement under the due process clause to actual notice. I understand that and and I think that so far it's been pretty clear from the record she was not entitled to actual notice. You know, looking at, looking at the facts in terms of actual notice, you were dealing with a handful of customers who had received these defective pipelines. They've been sued on the same pipelines and you had a situation where you could just, you know, easily send out a handful of notices. Here there's no way to reasonably determine in a cost efficient manner who is directly entitled to notice given the nature of this abuse and given the nature of the secrecy in which Larry Nassar was operating. Unless there was a direct report that somebody had been abused, it would have been impossible for them to, for USGAG to figure out who to send notice to and sending out notice to... Well they're saying your obligation, USGAG's obligation was not to send notice to people who were abused but to those who Dr. Nassar treated. And I think that it's, well I think they're saying beyond the treatment. I think that with respect to medical records, if Dr. Nassar had treated someone and maintained records, which we know he didn't by the way. We know he didn't maintain proper records. That's I think clear from the history of his case. But USAG had no obligation to maintain records, had no need to maintain records, frankly probably could not have maintained records given Dr. patient confidentiality. How are they supposed to ascertain based on records that at best were in the hands of MSU, Michigan State University, that actually employed Dr. Nassar? How are they supposed to know who Dr. Nassar was treating? So that's why there was a design to come forward and send direct notice to anybody who had come forward already, again after extensive media coverage, after numerous people had come forward asserting that they had been abused by Dr. Nassar. So again getting back to the Fogel, I think we also have to look in, so Fogel dealt with that limited number of of claimants. Here we had tens of thousands. Again it's not reasonable to, potential claimants, it's not reasonable to expect USAG to go and ferret out on the front end exactly who to send out notice to. The other I think big difference here is that we are dealing with, we're dealing with, in Fogel it was interesting, there was a pool, there was a fraudulent conveyance that was brought back into the estate as part of a settlement. That's a finite pool of assets. Here when we were negotiating with the insurance companies, this went into the whole analysis on prejudice to the estate under pioneer factors, we're negotiating with these insurance companies. We had to figure out who the claimants were. Allowing people to come in with late claims would have upset the entirety of the Chapter 11 case because it would have created a situation where we were negotiating with shifting sands. The entire settlement in this case was funded by insurance proceeds and the US Olympic and Paralympic Committee. Counsel, on that point, Mr. Buchheit, that brief notes that there was another late claimant, she was three months late, and then Jane was five months late. Is the fact of the mediation, the mediation took place, the only difference between the three-monthly claimant and then this attempted five-monthly claimant? No, there was, again, the standard that was being looked at there were the pioneer standards. It wasn't a direct notice question in that particular instance, and in that instance that particular claimant was literally in the hospital at the time of the bar date, and I think that the court found that she was incapacitated by that fact, which is a very different fact than what we were looking at here. In addition, to the extent that prejudice had been considered, I think that there is a difference in terms of prejudice when you're two months after the bar date and we really haven't begun mediation, or if we had exchanged offers, we were here, we were sky-high and they were dirt low. On the other side, but by the time we got, by the time the appellant's claim came in, we were well down the road of negotiation, and in fact it did actually take another year to settle, but we were narrowing and narrowing and narrowing and it was based on, the negotiations were ultimately based on the actual claims that have been filed. Subject to any further questions, I will rest. Thank you very much, Mr. Scharf. Rebuttal, Mr. Bouquet. James' claim was filed in October of 19. She had, she filed her motion and treated it as timely in August of 20. That same month, Judge Moberly denied the claim, yet apparently they hadn't made any headway until that point in the negotiations process, because bankruptcy judge James Carr was appointed as a mediator, special mediator, September of 2020. So to say that because James' claim somehow didn't exist until September of 2020, which is obviously false, that that would have somehow undermined the negotiation process, I just can't follow the argument. If you have nothing else, that's all I have. Okay, thank you very much, Mr. Bouquet. Our thanks to both counsel. The case will be taken under advisement.